Ohio Oil Co. *v.* Detamore—165 Ind. 243.

ceptions was filed in the clerk's office after it was signed by the judge.

As to the instructions given, it is evident that they are not in the record, as appellants have not complied with the practice, as laid down in *Thompson* v. *Thompson* (1901), 156 Ind. 276.

The petition for a rehearing is overruled.

OHIO OIL COMPANY ET AL. *v.* DETAMORE.

[No. 20,430. ,Filed March 28, 1905. Rehearing denied June 29, 1905.]

1. PLEADING. — *Complaint.* — *Corporations.* — *Presumption from Name.*—Where defendants are sued as the Huntington Light & Fuel Company and Ohio Oil Company the presumption is that they are corporations, and such presumption continues until defendants make an issue thereon. p. 247.

2. SAME.—*Complaint.—Initial Attack on Appeal.—Sufficiency.*— A complaint will be held sufficient, where attacked for the first time on appeal, unless there is a total absence of some allegation absolutely essential to a cause of action or the presence of an allegation absolutely destroying plaintiff's right of recovery. p. 247.

3. CONTRACTS.—*Gas and Oil Leases.—Contradictory Provisions. —Interpretation.*—Where contracts contain doubtful, ambiguous, inconsistent and absurd provisions the courts will look to the intention of the parties, such contracts being unenforceable according to the strict letter thereof. p. 248.

4. SAME. — *Parties.* — *Contradictory Provisions.* — *Intention.* — *How Ascertained.*—The intention of the contracting parties to a contract containing incongruous, contradictory and absurd provisions will be determined by viewing such contract as a whole and not from a consideration of the detached portions thereof. p. 248.

5. SAME.—*Gas and Oil Lease.—Interpretation.*—A gas and oil lease, giving defendant, in consideration of $120, all of the oil and gas under certain land, with the right to explore, and in case no well should be completed within six months the lease to be void, unless defendant should pay $120, in which event defendant should have another six months, said lease being subject to continual renewal by succeeding payments, and which lease contains no promise by defendant to do anything, amounts to a six-month option preventing lessor, after receiving the consideration, from leasing to another during such time. p. 249.

6. CONTRACTS.—*Mutuality.*—A gas and oil lease giving the lessee the option to pay a certain sum and thus extend the lease is operative against the lessor during such extension only upon payment of such sum, contract rights being correlative and mutual. p. 250.

7. SAME. — *Renewal.* — *Waiver.* — Where the lessee had abandoned his lease by nonpayment, as provided therein, and such lease had become void, the fact that the lessor permitted the lessee to "come back," upon payment of the amount that would have been due by a continuance of the old lease, constitutes a new lease, by parol, upon a new consideration. p. 251.

8. SAME.—*Gas and Oil Lease.—Abandonment.*—A lease, giving the lessee six months in which to put down a well and the option to continue the lease upon payment of a certain sum at the beginning of each six-month period thereafter, is inoperative where seven months have passed without the payment of any money or the drilling of any successful well, the lessee having, for such period, abandoned the premises. p. 252.

9. SAME.—*Revival After Suit Brought.*—Where the lessee has lost his rights under a lease and the lessor has commenced an action to quiet his title, the lessee by reëntering over the lessor's objections can not revive any rights to the premises. p. 252.

10. EVIDENCE.—*Question Assuming Facts Not Proved.*—It is not error to refuse to permit the question whether the witness knew the expenses of constructing "three wells," where but two wells were constructed before suit was brought. p. 252.

11. APPEAL AND ERROR.—*Supreme Court Rules.—Briefs.*—Questions relating to the admission and exclusion of evidence must be presented as required by clause 5 of rule 22 of the Supreme Court. p. 252.

12. SAME.—*Erroneous Instructions.—Right Result.*—Where the judgment of the trial court is manifestly correct, the giving of erroneous instructions is not reversible. p. 253.

From Huntington Circuit Court; *Levi Mock,* Special Judge.

Suit by Levi Detamore against the Ohio Oil Company and another. From a decree for plaintiff, defendants appeal. Transferred from Appellate Court under §1337u Burns 1901, Acts 1901, p. 590. *Affirmed.*

*Kenner & Lucas,* for appellants.

*Watkins & Morgan, Field W. Swezey* and *Robert M. Van Atta,* for appellee.

HADLEY, C. J.—On August 29, 1895, appellee and wife entered into a contract with the Huntington Light & Fuel Company whereby appellee, in consideration of $120, in hand paid, conveyed to the light and fuel company all the oil and gas in and under 242 acres of described real estate, together with the right to enter thereon for the purpose of drilling and operating for oil, gas or water, and to erect such structures and pipe-lines as should become necessary for the production and transportation of oil, gas or water from the premises. Appellee was to have one-eighth of all the oil produced and saved, to be delivered in pipe-lines connected with the wells. If gas only was found, appellee was to have $100 each year for each well. Further stipulations were in these words: "In case no well is completed within six months from this date, then this grant shall become null and void, unless second party [light and fuel company] shall pay said first party $120 in advance for each six months thereafter that such completion is delayed, and second party shall have the right to use sufficient gas, oil or water to run all necessary machinery for operating said wells, and also the right to remove all its property at any time. * * * All conveyances and agreements herein set forth between the parties hereto shall extend to their successors, heirs, executors and assigns."

The Huntington Light & Fuel Company assigned its interest in the contract to appellant Ohio Oil Company. After the initial payment of $120 at the time of the execution of the contract appellant Ohio Oil Company and its assignor advanced a like sum three times at the end of consecutive six-month periods, thus postponing to August 29, 1897, the time in which a well should be completed. In March, 1897, a well was sunk on the land by the company, which proved to be what is termed a "dry hole," whereupon the company took down and removed from the premises its drill and other appliances. No further periodical payments were made or tendered, and no further step was taken

by appellants to assert a right under the contract, until the spring of 1901, a period of four years, when appellant Ohio Oil Company by E. W. Morin, its district superintendent, entered upon the land to put down a second well. Appellee objected and forbade the entry, claiming that the rights of the company under the contract were at an end. After some parleying, appellee proposed that if appellant oil company would pay the back rent—$960, or more, being then due and unpaid—upon the basis of the old contract's being still in force, and operate the place, it "might come back." Morin said he would refer the matter to the general superintendent for decision, and expressed the belief that the proposition would be accepted. Whereupon, in appellee's presence, Morin proceeded tentatively to select a place for the second well, and drove the stakes to mark the spot for the drill, and for the engine-house. Morin also then negotiated with appellee for some trees from which to construct a derrick and other appliances. Morin then took his departure, and in three or four days communicated to appellee that he had conferred with the general superintendent, and was directed by the latter to go ahead with the well. The second well was then undertaken, and completed in May, 1901. The back rent was neither paid nor tendered, in whole or in part. The well was a small producer of oil. Appellant oil company pumped it until January 1, 1902— obtaining in the time 250 barrels of oil—and then took down and removed from the premises all the machinery and appliances it had been using. The matter then rested, without any further steps being taken by appellant oil company to operate or develop the land, until August 12, 1902, when appellee brought this action to quiet his title against any claim of appellants. August 18, 1902, and pending this suit, over appellee's objection, appellant Ohio Oil Company returned to the premises and drilled well number three.

· The complaint is in a single paragraph, and in the usual statutory form to quiet title. Both defendants answered the general denial. Verdict and judgment quieting the plaintiff's title.

The assignment calls in question the sufficiency of the complaint, and the overruling of appellants' motion for a new trial.

The first assault upon the complaint is made in this court. The infirmities alleged are the absence of averment that the defendants are corporations, and that the

1. defendants' claim is a cloud upon the plaintiff's title. The defendants are sued as the Huntington Light & Fuel Company and the Ohio Oil Company. As to the last point, the language of the complaint is "that the defendants' claim is without right, and unfounded, and a cloud upon the plaintiff's rights." The complaint was good · as against a demurrer, if one had been timely presented. There is no substance whatever in the last point, and it has been uniformly held in this State since the days of Judge Blackford *(Harris* v. *Muskingum Mfg. Co.* [1836], 4 Blackf. 267, 29 Am. Dec. 372), that in a complaint, where the name of the plaintiff or of the defendant is stated in such words as to imply a corporation, the party—plaintiff or defendant—will be presumed to be a corporation until the fact is put in issue by a denial. *Smythe* v. *Scott* (1890), 124 Ind. 183; *Adams Express Co.* v. *Harris* (1889), 120 Ind. 73, 7 L. R. A. 214, 16 Am. St. 315; *Indianapolis Sun Co.* v. *Horrell* (1876), 53 Ind. 527.

Besides, the first attack, coming in this court, finds far less support, and, to be successful here, it must be pointed out that in the complaint there is a total absence of

2. averment of some fact essential to the existence of a cause of action, or the presence of some averment that absolutely destroys the plaintiff's right to recover. *City of South Bend* v. *Turner* (1901), 156 Ind. 418, 54 L. R. A. 396, 83 Am. St. 200, and cases cited.

The first question presented, as arising under the motion for a new trial, is whether the verdict is sustained by sufficient evidence, and is contrary to law.    The facts stated at the head of the opinion are fully supported by the evidence.

3.

Whether it proceeds from design of crafty speculators in oil and gas leases to enshroud their contracts with doubtful, ambiguous, inconsistent and absurd provisions, as a means of promoting their interests; or whether it comes from a custom in the rural districts of employing unskilled draftsmen, it is a notable fact that few subjects of contract contribute to the courts an equal proportion of written agreements for interpretation.    The fact is so patent that courts generally, in gas and oil states, have come to place such contracts in a class of their own, and to look critically into such instruments for the real intention of the parties, because it so frequently happens that they can not, on account of incongruous provisions, be enforced according to the strict letter of the contract.    *Woodland Oil Co.* v. *Crawford* (1896), 55 Ohio St. 161, 177, 44 N. E. 1093, 34 L. R. A. 62.

The mutual understanding and intent of the parties, as to purpose, scope and ultimate object to be attained by the contract, that inspired and accompanied its execution, is controlling, and must be determined, not by detached provisions, but by viewing the instrument as a whole.    The contract before us belongs to a rare type. It contains no express covenant to be performed by the company.    It contains no promise of the company that it will ever drill a well; no promise that it will renew the term of six months by payment in advance of $120, called "rent."    The sum total of the company's unconditional agreement is that, if it failed to do one thing or the other— that is, if it failed for six months to complete a well, or advance $120 for another term—the contract should be at an end.    This case is radically unlike the cases of *Gadbury*

4.

v. *Ohio, etc., Gas Co.* (1904), 162 Ind. 9, 62 L. R. A. 895, *Hancock* v. *Diamond Plate Glass Co.* (1904), 162 Ind. 146, and *Consumers Gas Trust Co.* v. *Littler* (1904), 162 Ind. 320, with respect to the covenants of the lessee and termination of the contract.

In the case of *Gadbury* v. *Ohio, etc., Gas Co., supra,* it was stipulated that in case no well was completed within forty days from the date of the contract, the lease should be void, unless the company should pay the lessors $1 per day for the time completion was delayed beyond forty days. There was delay beyond forty days, and payment by the company according to the contract.

In the case of *Hancock* v. *Diamond Plate Glass Co., supra,* no time was fixed for the commencement or completion of a well, and the contract was "deemed" to commence from its date, and to terminate whenever natural gas ceased to be used generally for manufacturing purposes.

In the case of *Consumers Gas Trust Co.* v. *Littler, supra,* no time was fixed for the beginning of operations, nor for the completion of a well, but a covenant by the company that it would pay $40 each year until gas was found in paying quantities, or until it was discovered that it did not exist.

In this, as in other contracts of its class, the manifest purpose of the parties was exploration, and the mining of oil and gas. But here, to say the most of it, the grant is inchoate, and not absolute. It purports, upon its face, to grant all the oil and gas under the land, but in effect provides that, in consideration of $120, the grantee shall have six months in which to decide whether it will accept the grant by entering into possession and beginning the work of exploration. Viewed from end to end the contract amounts to nothing more nor less than a six-month option, with right of renewal, based upon a valid consideration, whereby the grantor bound himself not to lease the premises to another, and to give the grantee that length of

time to consider and determine whether it would undertake the development of the land upon the terms named. If the grantee had decided in the affirmative, and had entered upon the land, and proceeded with the execution of the contract, and completed a well within the option period, then acceptance would have been complete, and the grant effective. But by deciding in the negative that the prospect would not justify the expense, or by entering and drilling an unsuccessful well and then abandoning the enterprise, and removing belongings from the premises within the paid period, without renewal, the contract was fulfilled and exhausted by an exercise of the option not to develop.

Another test: The rent, or option money, was paid, in accordance with the contract, to August, 1897, and included the six months ending at that time. Suppose, as the fact was, that thereafter for four years the company did not drill a well, make a payment, or have possession, and that appellee had at that time brought an action to recover the back rent, or option money; could it be said, under the contract, in such case, that nonassumpsit would not have been a complete answer? Could not the appellant Ohio Oil Company have successfully said to the appellee: "I did not promise to pay you money?" And it is certain that if said appellant had a right to enter after the expiration of the paid period, it was liable for the rent. Contractual rights and obligations are correlative. For very similar and instructive cases see *Glasgow* v. *Chartiers Oil Co.* (1892), 152 Pa. St. 48, 25 Atl. 232; *Snodgrass* v. *South Penn Oil Co.* (1900), 47 W. Va. 509, 35 S. E. 820. This leads us to the conclusion that the drilling of a dry hole in the spring of 1897, and then taking down the rig and removing all machinery and other property from the premises, accompanied with the failure to pay in advance for another six months, marked the end of contractual relations between appellee and appellant Ohio Oil Company's assignor.

The arrangement effected between appellant oil company's agent and appellee, in the spring of 1901, whereby said appellant was permitted to "come back" and drill well number two was not a waiver of the default under the old contract, for the old contract having become *nil*, there was nothing issuing from it to waive, nor was it, strictly speaking, a rehabilitation of the old contract, but in all essential respects a new, independent, parol contract. The new contract was constructed on the lines of the old, as it properly might be, but it was supported by a new and different consideration, to wit, the payment of the back rent—that is, a promise to pay a sum of money equal to the sum appellee would have received if the payments for the several six-month renewals had been made as provided in the original contract—to which was added the further promise to continue with diligence to operate the place. So, after the making of the new contract in the spring of 1901, and immediately before the drilling of the second well, the contract relations of the parties were the same as under the former contract, with the additional covenant on the part of appellant Ohio Oil Company to pay a stipulated sum of money, and to continue to operate and develop the premises for oil and gas. This means that it was the new duty of appellant oil company not only to pay the money promised, but to complete a well within six months from date, or within that period pay appellee, in advance, $120, for further time, and to proceed with diligence in the exploration. As shown by the evidence appellant oil company paid no part of the money promised. It completed well number two within thirty days after the new contract was made, pumped it up to January 1, 1902—eight months—when it ceased, because the well was unprofitable, and again took down and removed all its machinery and appliances from the lands, thus quitting possession, and by its conduct announcing its abandonment of the enterprise. More than seven months were then al-

lowed to elapse without any steps being taken to make another well, or further to operate number two, or to continue rights in the premises by tendering money in advance, and then, to wit, August 12, 1902, appellee brought this suit to quiet his title against any further claim of appellant Ohio Oil Company.

And we think the suit was well brought. Under the contract it had made, appellant oil company could not blow hot and cold with appellee, and postpone development of the land to suit its own good pleasure. It was a case of "fish or cut bait." Having paid no money, completed no successful well, stopped operations, and quit the possession for more than seven months, it must be held that appellant Ohio Oil Company's rights in the premises had ceased.

A return to the place six days after the commencement of this action, with tools and machinery, and the commencement of the third well, over appellee's objection, did not better appellant Ohio Oil Company's condition. Its rights in the land having been lost by a disregard of its obligation, or by the exercise of its option not to go on with the exploration, its former rights could not, without appellee's assent, be reclaimed by anything it did, or offered to do, subsequently to the bringing of this suit.

In the trial the court refused to allow a witness for the defendant to answer the following question: "Do you know how much money has been expended on that lease in constructing these three wells?" The answer was properly refused for the reason, if for no other, that all the evidence shows that there had been but two wells drilled prior to the commencement of the suit.

Other questions as to the admission and exclusion of evidence are suggested, but not stated and presented as required by clause five of rule twenty-two of this court.

Chicago, etc., R. Co. *v.* Walton—165 Ind. 253.

Questions are also presented on the giving and refusing to give instructions, which we have not considered, for the reason that the result reached is so manifestly correct under the evidence that the instructions to the jury become unimportant.

Judgment affirmed.